IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WILLIAM CAIN,<br><br>    Plaintiff,<br><br>v.<br><br>THE HANOVER INSURANCE COMPANY<br>a/k/a THE HANOVER INSURANCE<br>GROUP and ABC CORPORATION,<br><br>    Defendants. | CIVIL ACTION NO.<br><br>1:10-CV-0204-JEC |

**ORDER & OPINION**

This case is presently before the Court on Defendant's Motion for Summary Judgment [33]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Defendant's Motion for Summary Judgment [33] should be **GRANTED in part and DENIED in part**.

**BACKGROUND**

This case arises out of an insurance dispute. Following a fire that destroyed plaintiff William Cain's home and all of his personal belongings therein, plaintiff filed a claim against his homeowners insurance policy with defendant, The Hanover Insurance Company. Defendant balked at covering plaintiff's claim, however, arguing (1) that the home was not plaintiff's "residence premises," as defined by

the policy; (2) that plaintiff made material misrepresentations when filing his claim and during the defendant's investigation, which conduct permits the defendant to refuse coverage; and (3) that plaintiff burned down his own home, which obviously would disqualify him from collecting on his homeowners policy.

Following the denial of his claim, plaintiff filed the present suit in state court. There being complete diversity of citizenship and the amount in controversy exceeding $75,000, the defendant removed the case to this court. Presently pending is defendant's motion for summary judgment on all claims.

## **DISCUSSION**

### I.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on

AO 72A
(Rev.8/82)

the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  *Id*. at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion.  *Id.* at 323.  However, the movant is not required to negate his opponent's claim.  The movant may discharge his burden by merely "'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the non[-]moving party's case."  *Id*. at 325.  After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence designating "specific facts showing that there is a genuine issue for trial."  *Id*. at 324.  While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986).

## II. WHETHER THE PANOLA ROAD HOME WAS PLAINTIFF'S RESIDENCE

### A. Facts

The home that is the subject of the homeowners policy issued by defendant to plaintiff was located at 872 Panola Road in Ellenwood, Georgia. Plaintiff purchased the home in January 1990 and thereafter lived there with his then-wife, Leona. Leona lived with plaintiff in the home until sometime in 2003 or 2004, when she began to travel back and forth to Tennessee to help care for her oldest daughter, who was suffering from cancer. Eventually, Mrs. Cain ceased traveling to the Panola Road home, and has not been inside the home in several years.

In March 2008, defendant issued plaintiff a homeowners insurance policy covering his "dwelling on the 'residence premises' shown in the Declarations . . . .," which was the Panola Road residence. The home had been in a state of some disrepair at the time that Mrs. Cain ceased visiting, with significant water damage as a result of a leaking roof that Mr. Cain could not afford to have repaired. By the time that plaintiff purchased his homeowners policy with defendant in 2008, the home had deteriorated even further.

4

Specifically, in November 2007, the Code Enforcement Division of Henry County, the county in which plaintiff's property is located, received a complaint that plaintiff's home was dilapidated and a request that the division check for zoning and code violations. (Def.'s Statement of Material Facts ["DSMF"], attached to Mot. Summ. J. [33-2] at ¶ 28.)  After conducting an inspection on November 14, 2007, the following violations were found: (1) a dilapidated structure unfit for human habitation and/or in such an unsanitary condition that it is a menace to the health of the people residing in the vicinity; (2) an accumulation of rubbish, trash, refuse and junk; (3) obnoxious vegetation (tall grass and weeds); and (4) conditions that provide harborage for rats, mice, snakes, insects and vermin. (*Id*. at ¶ 29.)

Following the inspection, the Code Enforcement Division sent plaintiff a letter summarizing the County's complaints, as well as the code violations that had been found during the inspection. (*Id.* at ¶ 30.)  On March 24, 2008, a second inspection determined that plaintiff's residence was unsafe and beyond repair.  (*Id.* at ¶ 31.) "The entire roof had failed and caved in, leaving a large hole that allowed water to freely enter the structure, thereby causing the sheetrock to fall."  (*Id.*)  Mold and mildew were evident throughout the house, and the entire structure was infested with termites, which in turn caused further structural damage.  (*Id.*)   The house was

missing doors and windows and was littered with large amounts of debris. (*Id.*)

Notwithstanding the dilapidated state of plaintiff's home, five days later, on March 29, 2001, defendant issued a homeowners policy to plaintiff, which policy was effective immediately. (*Id.* at ¶ 2.)[1]

On April 10, 2008, the Code Enforcement Division sent plaintiff another letter informing him that his home had been in violation of local zoning ordinances and county codes since November 2007 and that the Henry County Building Department had declared the structure unsafe. (*Id.* at 32.) Following plaintiff's failure to comply with county ordinances and codes, the County initiated nuisance abatement proceedings for plaintiff's residence in August 2008. (*Id.* at ¶ 33.)

Plaintiff's property was visited by a Code Enforcement official for a third time on October 22, 2008. The residence was still in poor condition, with excessive overgrown grass, obnoxious vegetation, harborage, weed infestation, and numerous other hazards that made it unfit for human habitation. (*Id.* at ¶ 34.) Following this inspection, the Code Enforcement Division, on November 26, 2008,

---

[1] According to the plaintiff, he had maintained a homeowners policy on the home by using an insurance broker who moved his homeowners policy to different insurance companies, from year to year, depending on where the broker could obtain the best rate for the plaintiff. (William Cain Exam. [33-5] at 19.)

filed a Complaint to Abate Public Nuisance against plaintiff's property. (*Id.* at ¶ 35.)

A fourth inspection was conducted on December 8, 2008. (*Id.* at ¶ 36.) By then, most of the roof shingles had deteriorated, and either fallen into the structure or been blown off entirely, leaving excessive gaps throughout the roof area. (*Id.* at ¶ 37.) Without shingles, the underlayment of plywood had become soaked from the rain and was visibly rotted. (*Id.*) In several locations, the plywood had fallen into the structure causing the rafters to be exposed. (*Id.*) The garage door had been removed and a header was never replaced over the opening, causing the front of the house to sag, as well as leaving light fixtures hanging out of rotting overhangs. (*Id.* at ¶¶ 38, 39.) The doors and windows were severely damaged, with several doors being boarded up or missing altogether. (*Id.* at ¶ 16.) The rotting and collapsed overhangs around the house's perimeter caused the gutters to fall off, allowing more water to gain access to the interior. (*Id.* at ¶ 43.) The floors in the interior of the house were riddled with holes that most likely came from the failure of supporting floor joists. (*Id.* at ¶ 44.)

Finally, on January 8, 2009, a hearing was held in the Magistrate Court of Henry County regarding the Abatement. (*Id.* at ¶ 45.) At the hearing, the County gave plaintiff 90 days to repair his property so that it would meet Code. Plaintiff was told

7

that if he failed to repair the property, the County would demolish the structure and charge plaintiff for the demolition. (*Id.* at ¶ 46.)

On January 9, 2009, the County caused the meter to be pulled and power to be terminated on plaintiff's home. (*Id.* at ¶ 47.) Little more than a week later, on January 18, 2009, plaintiff's home, as well as all the property therein, was destroyed by a fire that both plaintiff and defendant agree was intentionally set. (Roberts' Decl. [33-4] at ¶¶ 3, 5; William Cain Exam. [33-5] at 95.)

As noted, the question before the Court is whether this Panola Road residence could be construed to be plaintiff's "residence premises" at the time of the fire. It is undisputed that the plaintiff never spent another night at his home on Panola Road after the County cut off his power, which occurred just over a week before the fire. At that point, he continued staying at a friend's nearby camper, where he had been staying for an undefined period of time before the power was cut off. The record is unclear, however, as to how much or often the plaintiff was staying in the residence prior to the power being cut off.

### B.  Discussion

Defendant argues that the insurance policy provides coverage for the fire damage only if the Panola Road house was plaintiff's "residence premises" at the time of the fire. Plaintiff disagrees,

8

contending not only that the term "residence premises," is unclear, but also that the evidence is disputed as to the extent of his occupation of the premises.

It is well settled that an insurer "may, by the terms of its policy, insure against certain risks and exclude others, so long as the terms are not contrary to Georgia law." *Varsalona v. Auto-Owners Ins. Co.*, 281 Ga. App. 644, 646 (2006)(citation omitted). Thus, an insurer may require "that the insured reside at the insured premises in order to maintain coverage under the policy." *Id.* (citation omitted). Moreover, when the language of the contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction of the contract is required or even permissible. *Id.* (citation omitted).

Unfortunately, although the meaning of the term "residence premises" has been the subject of litigation for some time, with different Georgia courts offering differing opinions as to just how narrowly it should be construed, the phrase is still found in the present policy, with no definition of the term or other explanation that is helpful to this litigation. In addition, a review of some of the decisions construing the term under Georgia law does not readily reveal a principle that would help this Court in crafting a definition of "residence premises" applicable to this case.

There are cases in which courts have found that the phrase "resident premises" did not bar recovery for an absent owner of the property. *See*, *e.g.*, *Scott v. Allstate Prop. & Cas. Ins. Co.*, 2010 WL 1254295 (S.D. Ga. Mar. 30, 2010)(Edenfield, J.)(insured's absence from her home for an eight month period of time while she was incarcerated, and during which the house burned, did not constitute a change in the use of the "residence premises," as Georgia courts strictly construe the phrase against insurers and as a change of residence requires an intent to do so, and forcible change in an individual's state of residence does not alter it); *Roland v. Ga. Farm Bureau Mut. Ins. Co.,* 265 Ga. 776, 777 (1995)(noting that a contract of insurance should be strictly construed against an insurer, court found coverage for a divorced spouse/named insured who had moved out of the home one month before the fire, noting it is "untenable and inequitable" to deny coverage to a named insured who has an "insurable interest in the marital property, has paid premiums to insure that property, but finds that coverage voided simply because he or she elects to live apart from a spouse for a period of time due to the uncertainties of a precarious marriage"); *Hill v. Nationwide Mut. Fire Ins. Co.*, 214 Ga. App. 715, 715-16 (1994) (noting that test is not what an insurer intends its words to mean, but what a reasonable insured would understand them to be, court found coverage for fire damage, where owners had moved from the home

10

two months before the fire; court concluded that home could still be considered the "residence premises...mainly used as a private residence," even though it was temporarily vacant.)

Cases in which courts have found that an absent owner's claim would be defeated by the "residence premises" clause include: *Slater v. State Farm Fire & Cas. Co.*, 1:09-cv-1437-JOF, Opinion & Order [36] (Jan. 28, 2011) (court found no coverage for fire damage where mother and children left home four months before fire while mother was attending out-of-town college, utilities had been shut off, and father spent most nights in his repair shop); *Varsalona*, 281 Ga. App. at 645 (where owners bought home with intention of living in it, could not sell their own existing home, and instead had their daughter move into the home, court found no coverage for fallen slab because the named insureds had never lived in the home); *Grange Mut. Cas. Co. V. DeMoonie*, 227 Ga. App. 812, 814 (1997) (court found no coverage where owner had moved from the home, rented it for a few months, the home was then vacant over 30 days, and owner was about to relet the house at a time when it burned; in addition, court "disapprove[d] of the strained reading of the exclusions provision" in *Hill v. Nationwide*(cited above)); *Epps v. Nicholson,* 187 Ga. App. 246 (1988) ("residence premises" clause precluded recovery by plaintiff for a house that was, and had always been, a rental unit).

Taking the facts in the light most favorable to plaintiff, the plaintiff spent no time, or nights, in his home once the power was turned off, which occurred about a week before the fire. He had owned the home as his only residence for almost twenty years before that event, had consistently maintained a homeowners policy, and had maintained electrical power in the home until the County turned the power off following the nuisance abatement hearing and due to the condition of the home.[2] The defendant has not yet provided legal authority to this Court sufficient to persuade it that, as a matter of law, the above facts mean that the home was not the plaintiff's "residence premises." Accordingly, the motion for summary judgment is **DENIED** on this ground.

The Court is required to take the facts in the light most favorable to the plaintiff; a jury will not be so obliged. Accordingly, the Court assumes that the defendant will argue at trial that the plaintiff had been absent from his home for a period of time substantially longer than one week before the house burned down. Once that period of time is nailed down a bit better for a jury than

---

[2] One could reasonably assume that it is unlikely that the plaintiff was residing in the home, in any meaningful sense, for many months prior to the fire, given the extreme state of disrepair and damage to the house. Nevertheless, that the house was uninhabitable by any reasonable standard does not necessarily mean that one can conclude, as a matter of law, that it was uninhabited, as the plaintiff had long demonstrated a tolerance for living in squalid conditions.

12

it was for the undersigned, the former will be required to decide whether the plaintiff's absence for the given period of time, combined with all the other facts, means that plaintiff's home was no longer his "resident premises."  To enable the jury to make this decision, the parties should be prepared to submit to the Court a proposed instruction that is tailored to the facts of this case and construes any ambiguities in the policy terms against the defendant. Although the Court is not presently clear on what the definition of "resident premises" should be, given the particular facts of this case, it will not leave the jury on its own to arrive at a definition.

### III. MATERIAL MISREPRESENTATIONS

Defendant also argues that plaintiff is precluded from recovery in this case because he made material misrepresentations as to certain items that he claimed were lost in the fire and as to certain facts important to the insurer in investigating the claim.  The Court concludes that there are disputed issues of material fact as to this defense, and summary judgment is **DENIED** on this ground as well.

### IV.  PLAINTIFF'S SUSPECTED ARSON OF HIS HOME

Defendant believes that plaintiff burned his own home down. Defendant bases its suspicion on some persuasive circumstantial evidence.  That is, bringing in only about $600 a month from social security benefits, the plaintiff's financial situation was so bleak

13

that he was unable to afford to maintain his home and keep it even minimally habitable.  Indeed, it took almost all of plaintiff's social security check each month to make his mortgage payments. Plaintiff often had to depend on the kindness of a good-hearted friend, Gary Camp, who allowed plaintiff to work at Camp's fruit stand and who provided plaintiff with meals and the money needed to pay his monthly utility bill.[3]

Moreover, plaintiff was pretty much at the end of his rope in his efforts to keep his home, in the wake of the repair expenses he faced.  He had recently attempted unsuccessfully to refinance the home by getting a rehab loan or a reverse mortgage that is sometimes available to the elderly.  While plaintiff, who was 77 years of age at the time of the fire, was old enough to qualify for a reverse mortgage, his income level was too low for him to obtain the mortgage.

Once the county had announced that plaintiff would either have to repair his home sufficiently to render it habitable or else reimburse the county for the costs of demolition--neither of which was feasible for the plaintiff--he had every incentive to attempt to recoup whatever money he could through his only avenue left: the homeowners policy.  Indeed, the county indicated that it would

---

[3] It was this same friend who provided a camper for plaintiff to sleep in during some of the time prior to the fire.

14

foreclose on the property if plaintiff did not pay the demolition costs.  In addition to motive, plaintiff had opportunity, as his alibi is supported largely by his own word.

Finally, defendant accurately notes that plaintiff's explanation as to how he learned about the fire is a bit suspicious.  The fire occurred around 2:00 a.m on a Sunday morning.  Yet, heading off for church from the camper at around 8:45 a.m with a fellow churchgoer that Sunday, plaintiff told this lady friend that his house had burned down the night before.  When later pressed on how he could have known this, plaintiff has offered inconsistent accounts, including an explanation that someone whose name he did not know had telephoned him during the night to tell him about the fire, as well as plaintiff's speculation, as a religious man, that "the Lord" had come to him that night to tell him what had happened.

All of the above evidence may well persuade the jury that plaintiff burned his own house down and, for that reason, he should not be able to recover on his homeowners policy.  The Court does not deem this evidence, however, to be conclusive enough for the Court to decide as a matter of law that plaintiff is guilty of arson.  For one thing, plaintiff adamantly denies that he burned his house down. From reading plaintiff's deposition and sworn examination, he appears to be a colorful person whom the jury could perhaps find to be credible, albeit plaintiff does not appear to have been entirely

15

truthful as to some of his claimed losses or as to other assertions he has made during the litigation.  In addition, plaintiff claims that several other houses had been burned down in his neighborhood and he suspects that one of the pyromaniacs responsible had also torched plaintiff's home.  Indeed, given the wreck that plaintiff's house had become, it is always possible that a neighbor, weary of the slow pace at which the county was correcting the situation, decided to engage in his own form of nuisance abatement.  While the Court is uncertain that a jury will find persuasive plaintiff's alternative theories for the fire, the possibility that a jury might means that this Court cannot declare, as a matter of law, that plaintiff burned his house down.

Accordingly, summary judgment is denied on this ground as well. In short, the Court **DENIES** defendant's motion for summary judgment as to liability.

**V.   BAD FAITH CLAIM**

In addition to his claim to recover losses covered by the policy, the plaintiff also alleges that defendant's denial of his insurance claim was done in bad faith, in violation of O.C.G.A. § 33-4-6.  Defendant seeks summary judgment on this bad faith claim.

"To support a cause of action under O.C.G.A. § 33-4-6, the insured bears the burden of proving that the refusal to pay the claim

16

was made in bad faith." *S. Fire & Cas. Ins. Co. v. Nw. Georgia Bank*, 209 Ga. App. 867 (1993)(citations removed). If an insurer can show a reasonable and probable cause for making a defense, it vindicates its good faith as effectively as would a complete defense to the action. *Id.* (citations omitted). The penalty of bad faith is simply "not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact." *Fortson v. Cotton States Mut. Ins. Co.*, 168 Ga. App. 155, 158 (1983). "[I]t is the very fact that certain factual issues regarding the merits of a claim are in genuine conflict that causes there to be no conflict, as a matter of law, whether an insurance company had reasonable grounds to contest a particular claim." *Rice v. State Farm Fire & Cas. Co.*, 208 Ga. App. 166, 169 (1993). Consequently, when examining the evidence, a "court should carefully scrutinize any claim of a contest in facts to preclude the reliance by an insurance company on fanciful allegations of factual conflict to delay or avoid legitimate claims payment." *Id.*

While the Court has denied defendant's motion for summary judgment, it concludes, as a matter of law, that defendant had multiple reasonable grounds to deny plaintiff's claim. As to whether plaintiff's home was "residence premises" at the time of the fire, depending on how long the plaintiff had been living away from his home, a jury may well conclude that it was not. Certainly, defendant

17

had a reasonable basis for making this argument. As to plaintiff's alleged misrepresentations, defendant likewise has sound evidence on which to base this defense.

Finally, the evidence asserted by defendant in support of its accusation that plaintiff burned down his own home is solid. Considering that an "insurance company can prevail in an arson defense based solely on circumstantial evidence if it shows that the fire was of incendiary origin and that the plaintiff had both the opportunity and motive to have the fire set," *Fortson*, 168 Ga. App. at 158, the Court concludes that defendant did not exercise bad faith in denying plaintiff's claim.[4] *See also Grange Mut. Cas. Co. v. Law*, 223 Ga. App. 748, 750 (1996)(reversing trial court's failure to grant insurer a j.n.o.v. on claim of bad faith after insurer presented sufficient evidence showing that it had reasonable grounds to contest insured claims, in that evidence showed that insured had both the motive and opportunity to start fire.)

Indeed, were this case being prosecuted as a criminal arson, the prosecution might well withstand a motion for judgment of acquittal on this evidence. Whether or not a civil jury concludes that plaintiff burned down his own home, the defendant's contention that

---

[4] Indeed, while plaintiff characterizes it as "minimal" and "developed after the fact," he does concede that defendant has presented circumstantial evidence to prove that he committed arson. (*See* Pl.'s Resp. [41] at 13-14.)

he did is based on reasonable grounds and was not made in bad faith. Accordingly, defendant's Motion for Summary Judgment [33] on this claim is **GRANTED**.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendant's Motion for Summary Judgment [33].

SO ORDERED, this 16th day of September, 2011.

/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)